Number four, that is 14, that's 0888. For the appellate, this is Jason Jordan. You are here. And for the appellate, James Majors. Mr. Jordan, you may proceed. May it please the court. Good morning, your honors. Good morning, counsel. My name is Jason Jordan. I'm from the appellate defender's office and I represent D'Amico Hill. This is a case where the government made promises on more than one occasion to D'Amico Hill that it would not seek further prosecution. On both occasions, my client provided information, incriminating information, to the government. And on both occasions, the government did not live up to its end of the bargain. Now, I'd like to discuss argument one first, but I want to just give the whole background. So the first promises were when Detective Kaler said he was not going to go up and add a gun charge. In reliance on that promise, D'Amico Hill talked about moving a gun. And then a year later, the state added a gun charge. Directly after that, the state and D'Amico Hill entered into a cooperation agreement. Now, pursuant to this cooperation agreement, the state was seeking information pertaining to an unsolved homicide of Caleb Witte. Detective Pruitt testified that from the information that D'Amico Hill provided led them to a man named Daniel Jones, who possessed the weapon that was involved in the Witte homicide. Also, Detective Kaler testified at the hearing, but I think before I talk about that, I want to point out that that conviction happened before the jury trial in this case. And the state never informed my client or his attorney below that they had obtained a conviction using D'Amico Hill's information. Now, once the defense counsel found out that there was a conviction against Daniel Jones, he brought it before the court and a hearing was held. Now, there are two main clauses in the agreement. I term them the truthfulness clause. That's where the revocation power lied. That's where the state said, we're revoking this unilaterally. There's also a null and void clause. Now, concerning the truthfulness clause, the written agreement said that the state had the power to get out of the agreement if D'Amico Hill had provided false, misleading, or incomplete information. Now, at the hearing on cross-examination, Detective Pruitt admitted that the information was not false or misleading. There were several interviews that took place between Detective Pruitt and D'Amico Hill. And each time, Detective Pruitt said that on cross-examination, he said that there was additional information provided. Now, at that hearing, the state could have simply said, D'Amico Hill said this on one occasion and this on another occasion and shown an example of an inconsistent statement or something that was false or misleading, but they did not do that at that time. And so the trial court's finding that it was properly revoked pursuant to the truthfulness clause was clearly wrong. Now, there was also another clause in there called the null and void clause. Now, what the state was seeking was information involving the witty homicide or the firearm used. D'Amico Hill's information led them to the weapon that was used in the witty homicide. Detective Pruitt even testified that it was possible that that possession could have occurred on the day of the witty homicide. Yet, the court implicitly found that that term had not been satisfied. Well, it is possible isn't the term, is it? That's what you're arguing, but that's not what the agreement was. The agreement was for information involving the witty homicide and the Rutherford homicide and or the firearms used. The information he provided led to the firearm used. The agreement required someone responsible for witty's death was arrested and charged, not someone who might have been responsible. But that power, the way that the term is written, it's a bit vague and gives too much power to the state there. Because even if he was not the person who pulled the trigger, he still could be responsible in a way so far as after the fact or being an accomplice. This was a matter where the trial court heard the evidence and the arguments of counsel on this very point, was it not? Yes, it was. You know, this is a case where we have Judge Diamond, who not only had spent decades in criminal law, but had been the public defender for Macon County for years before he ever got on the bench 30 years ago. And someone who would understand these nuances and concluded that, no, this arrangement or this understanding of the state of this deal is correct and appropriate and the defendant, it was not, the state didn't breach it by charging this defendant. So I suppose two questions. First, what's the standard of review of that? And secondly, why shouldn't we accord to Judge Diamond's analysis that he was correct? Well, the findings of fact, Your Honor, would be subject to the manifest erroneous standard. The ultimate decision of whether or not due process was violated would be de novo. Well, but the historical facts, so to speak, as he found them, what part of those shouldn't we accept and why? Well, because Judge Diamond said that the state properly revoked the agreement, then I think you'd have to assume that he was talking about the truthfulness clause in that situation. So then it would go to the truthfulness clause. The truthfulness clause said if D'Amico Hill provided information that was false, incomplete, or misleading, then the state had the power to get out of the agreement by itself on its own power. But he was evaluating credibility, in part, when he did that. And the officer did testify that the manner in which the information came out over a period of time. And the defendant is saying, well, I remember more. But the officer testifies, I thought he was holding back, he was trying to steer the investigation. I mean, he's entitled to evaluate that, isn't he? The trial judge, I mean. Yes, Your Honor. And then that was on direct examination. But then on cross-examination, when he was asked if the information was false or incomplete, he said that it was not false. I mean, excuse me, false or misleading, he said it was not false or misleading. At that time, the state had an opportunity just to provide one single fact. One single fact of why it was so misleading when they had over a course of three interviews between D'Amico Hill and Detective Pruitt. And so I think stepping back and looking at this, there's two standards at play here. One is that the government drafted the agreement. So with these terms, a vague term like the responsible term should be construed against the draft of the agreement. And then also, for a cooperation agreement, our Supreme Court has said that the strictest standards of fairness apply. Now, I think when the state got a conviction using my client's information on the murder weapon used in the Woody homicide, but did not disclose that to my client or his attorney before my client went to the jury trial, in this case, I don't think that comports with the strictest standards of fairness. So on that issue, D'Amico Hill would ask for reversal and then also a remand to enter the terms of the agreement. Now, if I could move to the second issue involving the confession. I'd like to quote Detective Kaler here first. This was from the interview that occurred on September 7th. Quote, we're not going to go up and add to your charges a gun charge, end quote. And if I could quote him further, we're not looking, Detective Kaler that is, quote, we're not looking into charging people with moving guns. There were several instances of statements like that from Detective Kaler to D'Amico Hill. In reliance upon that assurance, that promise, believing that, D'Amico Hill talked about moving the gun. And in fact, a gun charge wasn't added until a whole year later. As far as the lower court's ruling, there was a hearing and there was testimony. As far as the lower court's ruling, the trial court said that, characterized it as Detective Kaler had minimized his interest in the gun charge. But he never basically flat out said he wanted it. But I think that's contradicted by the one statement where it says, quote, Detective Kaler told D'Amico Hill, quote, we're not going to go up and add to your charges a gun charge, end quote. I think when you look at the totality of the interview, what's going on there is Detective Kaler is trying to get D'Amico Hill to talk about moving the gun after the fact. Because they have a witness, Carla Brazier, who has already told the police that. And so what happens is, Mr. Hill comes back and says, well, I want an assurance that you're not going to basically get me on the murder charge for this. And so what Detective Kaler does is come back and gives him, gives Hill assurances on the gun charge. With statements such as, quote, we want the murderers. We don't want after the fact stuff. We don't give a shit about that. We've never given a shit about that in cases, and we never will, end quote. So the strategy here is to assure Mr. Hill that no gun charges are going to be made if he talks about moving the gun after the fact. Now, in reliance upon that, D'Amico Hill talked about moving the gun. Well, what does it mean when the officer, three different times, says, I can't guarantee that, I can't guarantee that, I can't guarantee that. I don't know whether the state attorney would do that or not. And in the middle of that, defendant says, I ain't talking about the gun charge. At that point, it's clear, or seems to me to be clear, that he's worried about the murder. What do those words mean when a police officer says, I can't guarantee you anything? And he repeats it during the course of the interview that you're talking about. Don't those words mean as much as what defendants hope that the cooperation is going to bring? The word guarantee there was used in context on the murder charge. That's what Detective Kaler was saying. So Detective Kaler would say, I can't guarantee you anything on the murder charge, but, and if I could quote him again, Your Honor, quote, but I can, and he uses the word guarantee here, I can guarantee that I want my investigation to lock up the shooters. And so what he's doing is he's saying, I can't guarantee on the murder charge, but I can guarantee you that no gun charges are going to be added. And so that's when he says, the guarantee statements are always in relation to the murder charge. Isn't this, again, a matter addressed in the trial court's judgment, having heard all these people, and your argument has to be, trial court's rejection of this argument has to be contrary to the manifest rate of the evidence? We did, Your Honor, we did argue for DeNovo because it's all in the three-hour interview, but there was a hearing, there was testimony by Detective Kaler and D'Amico Hill. How would it be DeNovo? Are you backing off of that? Even under the manifest standard, the trial court said Detective Kaler minimized his interest in the gun charges, but he never actually said that they weren't going to add a gun charge. And I just bring you back to the one quote where it's undeniable, he said that quote, we're not going to go up and add to your charges a gun charge. And then when you take that quote with all the other statements about the police interest, such as we're not looking into this, we want the murderers, things like that, it reinforces that one statement that says, we're not going to go up and add to your charges a gun charge. And so when the trial court said, to get back to the standard there, when the trial court said he merely minimized it, but he never flat out said that, that's just contradicted by the record. What other charges would he add to? Can you repeat that question, Your Honor? He uses the word, we're not going to add that to your charges. What are the other charges? He specifically says, Your Honor, in the quote I'm quoting, we're not going to go up and add to your charges a gun charge. Add to your charges a gun charge. What are the charges that the gun charge would be added to? The murder charge, Your Honor. And so he was about to be charged with murder, I think he was officially, the indictment, or the information was officially filed a couple days later, and then one year later, the gun charge was added. And then a couple months after that is when they did the cooperation agreement. Well, that makes it sound like the defendant is not, I mean, the later things that he says, that's not the case. That's not what I'm talking about, that ain't what I'm talking about. He's not worried about the gun charge. That's an afterthought. And at that moment, the police aren't interested in a gun charge. At one point he tells him, I don't care what you say about that, we've already got you. Because they had other witnesses to the gun and his possession of it. So as far as that, the reason that he's not, D'Amico Hill is not concerned at that point before he confesses to moving the gun is because he believes Detective Kaler. He believes what the affirmative declarations that Detective Kaler has given him about the gun charge. And it's only at that moment, after Detective Kaler has made several statements regarding the gun charge, over two hours into the interview is when D'Amico Hill starts to talk about moving the gun. And so on issue two, it would be in the alternative, we would ask for a remand and a new trial. Are there any further questions? Thank you, Your Honor. Thank you, counsel. Mr. Majors. May it please the court, counsel. The state's first argument is that the defendant's statement, the phone call to his wife, which was recorded, was never objected to. And was not raised in a post-trial motion, but nevertheless was shown to the jury with no objection. And in that phone conversation, which there's a video of, the defendant tells his wife that Junebug, who is, that's the nickname for a man named, excuse me, Estes, Junebug informed on him. So in response, he informed on Junebug and said that he moved the gun, being a convicted felon, that he had possessed a gun by his admission to his wife. State's position is that was never raised in the motion. And they will, their response will be, well, we said all statements, but if you look at the record, there were several conversations on different days between the detective and the defendant. And before the motion was heard, they limited it to just September the 7th, I think. And if you look at the post-trial motion, it only refers to statements made to Detective Kaler. It doesn't make any reference to the video recording of the defendant talking to his wife, in which he admits to possessing a firearm. If that argument is valid, then any ruling on the motion expressed was harmless, because the same evidence came in, the same evidence, the same videotape of, or videodisc, I'm sorry, of the defendant talking to Detective Kaler also has the defendant talking to his wife. Further, it's harmless because we have Defendant Paramore Brasier, Ms. Brasier, plus the DNA evidence, which was astronomical in favor of the defendant having possessed the gun, shows that he was guilty. All this stuff about the defendant being misled by Detective Kaler, and the state hiding all this evidence about Mr. Jones is not supported in the record. The motion, the gun charge was filed, count 10, on August 9, 2012, with no objection by the defense. Why? Well, because the defendant had gotten out of a murder charge, that's why. The state moved to amend that same charge on January 3, 2014, no objection by the defense. Why? Because he was getting out of a murder charge. Defendant's statement and allocution at sentencing, page 95 and 99 for the convenience of your staff, I'll be brief, this is the defendant. First, I want to start off saying that I'm not saying that I'm not guilty. I tried to plead guilty to the charge of the gun back in 2012, which was two years ago. Defendant on page 99. Two years ago, I offered to plead guilty to this, the gun charge. Does that sound like someone that's been misled by Detective Kaler? Then, if the state doesn't, or if the court doesn't find those arguments to be valid, we have Judge Coriel and Judge Dimon, as the court's already pointed out, you're talking about over 100 years as public defenders and trial lawyers and judges, making determinations as to who's telling the truth. If they can't tell who's telling the truth, I don't know who can. Now, as to this cooperation agreement, the court knows they just said it was in 2012. Jones pleaded guilty to dispossessing this gun during hot weather during 2012. There's no showing that Jones was responsible for the murder of Witte, and the agreement says the state can revoke it if it does not lead to an arrest and charge of at least one responsible for the homicide of Witte. Well, it didn't. And the defense, after getting out of a murder charge, then all of a sudden they wanted this weapons charge and then all of a sudden they want to fight that, so they start filing motions to suppress right on the day of trial. So then we have Judge Dimon review the whole thing, go through the tape again, and then two and a half months after he's found guilty, we have a barrage of motions. One of them is saying, now that we lost the trial, we snaked out of a murder charge, and then we lost this gun charge, now we want to go back two months after the trial, two years after the agreement, we want to get out a jail-free card and pull it out of our pocket. Well, this is volume 34, page 20. This is Mr. Baker, defense counsel. Your Honor, the terms of the plea agreement are for a specific sentence. The people are unwilling to allow him to enter into that at that time. In fact, the offer had been revoked at that time. And Judge Dimon found that the offer had been revoked prior to trial. Questions? Seeing none, thank you, counsel. Mr. Jordan, any rebuttal, sir? Yes, Your Honor. Okay. As far as the wife statement goes, that was part of the motion to suppress below. All the statements that occurred on September 7th were right before the hearing. They had thrown out the September 9th and September 30th hearings. They were only focused on the statements made September 7th, and that included all the incriminating statements he made, D'Amico Hill made. And also, that statement that he made to his wife was sandwiched in between during a two-and-a-half-hour interview with the police, and it was a 30-second statement, and it wasn't any new information. D'Amico Hill had just told Detective Kaler, admitted to moving the gun, and gave him some facts about that. Then he talks to his wife and said, this is what I told Detective Kaler, or I told the police I moved the gun. He didn't say anything new, anything that wasn't known. D'Amico Hill and Detective Kaler both were aware that the whole thing was being recorded. And so, D'Amico Hill never would have said that if it wasn't for the fruit of Detective Kaler's promise not to add a gun charge, where he then confessed, then said the statement to his wife. So it's all one package. If this Court were to say, hypothetically, the confession should be suppressed, but not the statements, it would not be harmless beyond a reasonable doubt, because that could have changed the trial attorney's strategy below, as far as not wanting all the previous parts of that interview, where showing Detective Kaler kind of pressuring D'Amico Hill. At that point, it could have changed counsel's strategy. Now, as far as the murder charge, and as the opposing counsel used the word snaked out of a murder charge, I don't believe the murder charge was not dropped until after the sentencing on the gun charge. So it wasn't as if the murder charge went away before the jury trial in this case on the armed habitual criminal offense. Yes, so unless there's any further questions, we would ask for relief on Argument 1 first, and then the alternative relief on Argument 2. Thank you, counsel.